Good morning and may it please the court. My name is Glenn Feldman, General Counsel to the Cabazon Band of Mission Indians. This case is back before this court for the second time. It's here today in a significantly different and different setting. And what we believe to be a significantly stronger factual and legal posture. We're asking this court to determine that when Cabazon police vehicles travel off-reservation, as they're required to do to provide law enforcement services, that they be deemed to be authorized emergency vehicles under California Vehicle Code Section 165. We believe there are three bases on which the court can reverse the district court here and fine for the crime. Well, let me ask you this, if it's preempted, would that allow the, how are you? You're back again, huh? Busy guy. Can't keep him away. I know. I have the same feeling. Well, I know. Would that mean that the vehicles could activate the lights as opposed to just driving through with the light bar on, not activated? Here's our answer to that, Your Honor. We believe that authorized emergency vehicle status does permit the use of the vehicle's normal law enforcement powers, the power to exceed the speed limit, the power to do what they need to do to respond to an emergency situation. However, that isn't what we're asking for in this case. We've asked the court to find that when traveling off-reservation, that the vehicles be permitted to have uncovered but operational emergency lights. We would be satisfied, we would be delighted with a ruling that gave us nothing more than that. So, Your Honor, in this posture of the case, you're not even asking for, even if there's an emergency in the different section of the reservation and they've got to traverse the non-reservation land, you're not asking that they be allowed to exceed the speed limit, they'll stop at all the stoplights, they won't turn on the lights? That's all you're asking for? We think the court could conclude that, but we are not asking for that. But you're not ruling it out either. We're absolutely not ruling it out. That's the next case, if we go along with your position. Your Honor, let me tell you what's going to happen. If we win on this, on the narrow issue, the county and the sheriff will get together and very quickly work out a cooperative agreement here. As the Court's aware, we already have a cooperative agreement. Cooperation seems to have been in kind of short supply in this case. I'm sorry? Cooperation seems to have been in short supply in this case. On this narrow issue, on this narrow issue, that's correct. But as the Court's aware, we already have a cooperative agreement with respect to tribal and county fire departments. The two fire departments have a cooperative agreement where they cooperate and respond to fires on and off the reservation. Let me ask you this, if I could, on the preemption question. You've got two possible tests. One of them is White Mountain and the other one is Mescalero. Under Mescalero, it seems to me you have at least the following possible argument, and that is Mescalero says for off-reservation activities by a tribe, I'm paraphrasing, the state has to treat the tribe no differently from the way it would treat other comparably situated entities. Now, does it change the case from the way it was when it was here last time? Because what we now have is a formal document deputizing the tribal officers that we did not have before, which brings the tribal officer in a situation that is more comparable to a federal law enforcement officer, such that similar treatment of similarly situated people gives you a stronger Mescalero argument? It absolutely does change the posture of the case, Your Honor. Does it give you a stronger Mescalero argument? Well, I think we had a Mescalero argument under either situation. No, I'm asking you a different question. It strengthens the Mescalero argument. Okay. Why didn't you make the Mescalero argument in your brief? Oh, I think we did, Your Honor. I think we indicated that you could. You quoted the language. Yes. And we indicated that the court, the district court, had erred in applying the Mescalero test. And we gave a number of reasons why that was incorrect. Under Mescalero, even under, let me say it this way, even under Mescalero, there is still normal federal conflict preemption available to the tribe. And we submit that given the posture of this case, given the deputation agreement with the Bureau of Indian Affairs, given the special law enforcement commissions that essentially federalized the tribal law enforcement operation here, that we have a direct conflict between the county's interpretation, Section 165, and the federally mandated requirements that tribal police vehicles operating under these agreements have operational vehicle lights on their roofs. So there is clearly a direct conflict that's available under the Mescalero standard. Okay. Which is the least intrusive to the State's interest, a federal preemption or that they're treating you differently than they're treating adjacent States? Well, I think they both intrude on the county's perceived interest here, because the county is saying under neither circumstance are we entitled to have the lights. We think there are different reasons why the court can conclude that we are entitled to them. But I think in any event, we require the court, we request that the court take a position that's contrary to their interpretation of this statute. Well, we don't have to reach the preemption question if we say that they're treating you differently than they're treating abutting States. You don't have to reach the preemption agreement, the preemption argument, under either of our first two theories. One is Commissioner Helmick's letter. The highway commissioner, the commissioner of the highway patrol, has written a letter basically saying in, we think, fairly clear language, albeit not written by a lawyer, but clear language written by a cop, that tribal police vehicles are authorized emergency vehicles when operating off the reservation. That alone, you could decide this case on that basis alone. Well, that's been somewhat watered down, though, hasn't it, that letter? Well, if you're referring to the letter of the general counsel. Yeah. Yeah. I mean, that's... Let me address that very briefly. Our view is, if you read the two letters, put them side by side, look at them time-wise, you'll see that they're not addressing the same issue. The general counsel, first of all, let me also mention to you that under the statute, it's the commissioner that has the authority to make this determination, not the commissioner's lawyer. So you've got the commissioner sending a letter three months later than the lawyer's letter. But even if you put the two letters side by side, they're addressing different issues. The general counsel's letter is saying, we don't have the authority, administratively, to determine that Section 165 has been preempted under the deputation agreement. A court has to decide that. And the letter is very clear on that. They say, we can't administratively determine that preemption ought to be applied here. The commissioner, on the other hand, his authority stands on a completely different footing. He has the statutory authority under 165F to determine that vehicles that don't meet any of the other categories, that don't fall into the other categories, can be treated as authorized emergency vehicles for certain purposes. And that's what he's done in his letter. So the two letters are not in conflict. They simply address two different aspects of this case. So we have the commissioner's letter. We also have the deputation agreement itself. And the deputation agreement itself mandates, and the law enforcement standards that operate with respect to these law enforcement commissions, mandates that the officers have operational light bars on the hooves of their cars. There's no question about that, even though the district court misunderstood, I think, what the intent of that was. Your primary argument is that this is a preemption case, in other words. Well, preemption, frankly, I think, is a third fallback position. I think the commissioner's letter is first. Second is that the deputation agreement in and of itself transforms the tribal vehicles into authorized emergency vehicles under Section 165E, in that they are vehicles being operated by an agency of the Federal Government. We think the deputation agreement federalized the tribal law enforcement department and these officers to the extent that their vehicles fall within Section 165E. So those are two separate agreements that we submit, which don't even involve the question of preemption. The question of preemption is obviously a more difficult and complicated issue. But let me address preemption, because I think there are two issues that need to be addressed. First, what standard applies, and what law, in our view, has this preemptive force? I've addressed with respect to Judge Fletcher, I've addressed a little bit that, you know, we don't believe that Mescalero is the appropriate standard here. Mescalero v. Jones. I thought you just said you did make the argument under Mescalero, and I was encouraging you to make it. I just heard you say now you don't make it. No. Maybe I didn't make myself clear. We say that Mescalero is not the correct standard, but even if it were the applicable standard, we can meet that standard under normal conflict preemption requirements, that there is a conflict between federal law and the operation of the state law. So I don't want to be misunderstood here. We absolutely do not believe that Mescalero is the correct standard. We believe that White Mountain Apache and the balancing test is the appropriate standard. But are you willing to make an argument under Mescalero? Yes. Okay. Yes. The normal conflict preemption applies and that there is a conflict, a direct conflict here, between the federal requirements to have operational vehicle lights on the roofs of police vehicles and the county's interpretation of Section 165. Let me offer three reasons why we believe the district court was incorrect in applying Mescalero. First, the court simply, the court did something that courts frequently want to do. They create a bright line rule. It's easier to, everybody's in favor of bright line rules. It makes everybody's life easier. But in this case, they did it by reading a critical qualifying word out of the Mescalero decision, and that is generally. The Supreme Court in Mescalero wasn't saying every time a tribal official goes off reservation, under any circumstances, with no exception, does State law apply. That isn't what the court said. The court said that it's generally true. And generally is an important word here. Now, how do we know that that's not true as an absolute proposition? Well, I'm going to cite to you some cases, and we've cited a number of cases, in which courts have held that tribal vehicles operating off the reservation are not subject to normal State laws. But more importantly, and this case is not one that we include in our brief, but I think it's important to cite here, is Washington versus the Confederated Tribes of the Colville Indian Reservation. Now, this is an important Indian law case, Supreme Court case from 1980. It's found at 447 U.S. 134. 447 U.S. 134. Now, this case is primarily cited because on the big issue of tribal laws, the question of whether they could sell tax-free cigarettes to non-Indians. It's an important Indian law case that didn't go the tribe's way. But there's a second, smaller element to this case, and that involves whether the State could apply a vehicle license tax to tribally licensed vehicles that operated both on and off the reservation. And at pages 162 to 164 of that decision, the Court addresses that. And the Court expressly rejects the application of the Mescalero test to that situation. The Court said, maybe, State, you can tax the off-reservation use of these vehicles, but you've got to tailor your tax. You can't just, if the vehicle goes off for one day of the year, you can't impose a full year's vehicle tax. You've got to narrowly tailor your tax to the off-reservation use. So I think Colville stands for the proposition that the word generally really does mean something in Mescalero. It is not a bright-line rule, and that given the facts and circumstances, you can reach different conclusions with respect to off-reservation activity. Now, let me just cite a couple of other cases that we've cited and discussed in our brief, and I don't want to go into much detail. Of course, the primary case that we think the Court ought to be guided by is Prairie Band of Pottawatomie Indians v. Pierce. This is the Tenth Circuit case that came out just a few months after the panel's decision in this case in 2001. In that case, the Tenth Circuit expressly rejected the Mescalero analysis and the application of the Mescalero test to on-reservation and off-reservation activities. I would point out to you that while that case, while the Tenth Circuit case only involved the question of a preliminary injunction, the matter has been remanded back to the District Court, and just a couple of months ago, the District Court, in an analysis we think is exactly on target, entered summary judgment for the Tribe, concluding that the State was without authority to require State licensing of tribal vehicles operating both on and off the reservation. Now, I maybe missed something. Did you give us a 28-J letter on that decision? I'm sorry? Did you give us a 28-J letter on that District Court decision? I did not, Your Honor. I'm not suggesting to you that it's binding precedent. We'd like to – Yeah. And let me give you the site. We've got a gum sheet. You can make out three copies and leave them with us. I'll do that, Your Honor. Let me give you the site. It's 276. Well, we don't write – I don't write these things down, you know. I'm just listening to you. Okay. It's 276 F sub 2nd 1168. And this issue is discussed at 1187 to 1194. And the Court goes through the entire analysis on reservation, off reservation, Mescalero, White Mountain, and concludes that White Mountain is the appropriate standard and that under those circumstances, the tribally licensed vehicles that we're seeing on – Okay. We've got a rule that allows you, indeed encourages you, to bring these to our attention before argument. We're happy to look on it afterwards, but Rule 28-J says, here, here's what you do. Okay. Okay. I will – Next time you're back with this case, you'll know. Thank you, Your Honor. So we've submitted substantial precedent that we think supports our view in this case. Finally, let me just – I want to reserve a couple of minutes for rebuttal. But let me talk for just a moment about the mandatory nature of these federal standards, because this is a critical issue. I mean, if you get to the preemption case, the question is, is there a conflict between the federal law, federal requirement, and the state law, which says you can't have operational lights when you go off reservation? The district court simply misread the federal law – the BIA law enforcement handbook. She suggested that it's simply a set of suggestions, and you can apply them if you like or not apply them if you prefer. That's absolutely not correct, and we've submitted in the case, in our brief, the Robert Nicholas, who's a BIA official, who tells you absolutely these are mandatory standards. Here's my problem with your 165E argument. 165E, the California statute, says that an emergency vehicle should be allowed, da-da-da, if it is owned or operated by the federal government or an agency thereof. Now, obviously, these vehicles are not owned by the federal government or an agency thereof. So the only option you have is it's operated by the United States. It's clearly not operated by the United States. Is it operated by an agency thereof? Now, I'm looking at a state statute. I'm not looking at federal law. And who's the federal agency that's operating this vehicle? That strikes me, actually, as a hard question, if you want to say that the BIA is operating this vehicle. The BIA has deputized the tribe to operate the vehicle, but is the BIA operating the vehicle? Well, Your Honor, these are tribally operated. These are tribal vehicles. Yes, I know. I mean, that's my problem. Okay. But our view is that under the deputation agreement, the federal government has, in fact, federalized the Cabazon Tribal Police Department. Keep in mind, not only do we have the deputation agreement. But is that operated within the meaning, not of federal law, but of the meaning of a state statute, which you're asking me to interpret? Yes, we believe that. Okay. But you understand my problem. Well, I understand. Yes, I understand your concern. I think three other things you need to keep in mind. Besides the language of the deputation agreement, you have the fact that these tribal vehicles are operated with United States government license plates. These cars are using federal license plates. The Cabazon Public Safety Department gets federal funding. And in order to get special law enforcement commissions, the officers have to go through mandatory federal training. So we think all those things together clearly bring the tribal police department within the ambit of the concept of federal law enforcement. And if a California state court tells us that that's not right as a matter of law under 165e, we have to defer to the California state court. That's to say, we're construing a state statute. Yes. If there were such a decision, I suppose you could. I don't know if you'd have conferred to it. I suspect you would probably pay it some attention. Okay. I'd like to reserve time. The problem with that argument is that, you know, the vehicle is still being operated by tribal officers, correct? Yes. They're not federal officers. They're not enforcing federal law. They're enforcing their own law, aren't they? No, Your Honor. They are enforcing federal law. That's the whole point of the deputation agreement and the special law enforcement commissions. They are authorized under that. That's what makes this case dramatically different than when it was here the last time. They are operating under this agreement. They are authorized under that agreement to enforce federal law. And the agreement itself says that they are deemed to be federal officials for certain specials. But are they enforcing tribal law enforcement or are they enforcing United States law? Both. They have the authority to enforce both. They've always had the authority to enforce tribal law. The deputation agreement specifically makes them federal officials and gives them the right to enforce federal law, which they didn't have before the deputation agreement came into place. So that's a critically important issue. They are federal. They are deemed to be federal officials for certain purposes. And they are authorized to enforce federal law. We were talking about like a commission of a felony. And they go on to investigate it and they get a drive down the state road. Yes. So they're enforcing federal law. They are authorized to enforce federal law and they are required to go off the reservation in order to do that because the four sections of the reservation are not contiguous. I'd like to reserve, if I have any time left, I'd like to reserve a couple of minutes. Thank you. May it please the Court. Timothy Coates on behalf of the defendants. I think that Judge Fletcher's question about nondiscriminatory state law does raise an issue that I don't think has previously been raised in the case. The question is to whether 165, whether the other vehicle code provisions are, quote, discriminatory. I don't think that's that. Within the meaning of Mescalero. That's right. I don't think that aspect of Mescalero has really been discussed, to tell you the truth. Would you like to do supplemental briefing if that turns out to be an important issue for us? If the Court, yes. I think that that might be appropriate. Okay. But I think that's why it's not in the briefs from either side. And I could get up here and free wheel on it, but to tell you the truth, it just has not gotten any play. Okay. I mean, at first glance. Well, just real quick, and I won't hold you to it. If contiguous States are allowed to go in 50 miles, is that correct? I think that's right. I think that's right. Yeah. And why should they, why should California treat Arizona any different, a sovereign State, than a tribal nation? If they want, these enclaves are not 50 miles apart. They're going less than 50 miles. Aren't they discriminating against the tribe? Well, I mean, I've looked at the law in terms of what constitutes discrimination against the tribe or improper discrimination. I mean, the States can do certain things to regulate. Clearly can take specific actions to regulate tribal activity off tribal lands. Well, no. I know they can do that. But my question to you is how aren't they treating two similarly situated entities differently who are in law enforcement? The Arizona police officers come in, go 50 miles. The tribe law enforcement agency wants to go from one place to another 50 miles, and they stop them. I can speak only to the fact that I know that the case law talking about the tribes as sovereign entities and the like kind of go back and forth, because they'll say they're complete sovereigns for some things but less of a sovereign for other things. For example, you know, Congress can do certain things to them that they can't do to the sovereign nation or even sometimes to States. And again, I'm kind of speaking on a, you know, off the cuff, but I'm aware of that line of cases. And I think the reality is that within the system they are not necessarily regarded as totally separate independent sovereigns on the same footing as States in some respects. And I can see certainly grounds for having a basis of distinction between the law enforcement functions of another State and the law enforcement of a tribe where there may not be as many. I think they're sovereign to the extent that Congress extends sovereignty to them in certain areas. Let me ask you this. Now, say this is Riverside County, right? So say you've got the Palm Springs Police Department, and they're chasing somebody and, you know, they leave the city limits and they're heading to Cathedral City. Is there a problem? I have to see where the problem is. In California, there are law enforcement jurisdictions. Well, there's another. I mean, there are law enforcement jurisdictions in California as peace officers extends for certain crimes throughout the State of California. I mean, there's sworn police officer personnel. And maybe that goes to one of the, you know, the limitations that are special on law enforcement. I mean, tribal police do not have authority all throughout the State of California. I mean, there are geographical limits, particularly in California. Well, does the Pasadena Police Department have – they can go down to the desert or they can go up to San Francisco? They can perform an arrest, yes. I mean, certain things, yes, they absolutely can. A California peace officer is a California peace officer who can arrest for a felony. I mean, there are jurisdictional things on pursuit policies. But there's something different about full law enforcement status for State police officers. And I think one of the points that, again, we have to spin here, that there is something about law enforcement with tribes that's different, too. I mean, there are different types of tribal police departments depending on what State you are because the State's authority over tribe members on tribal land is different. California is a PL-280 jurisdiction where State police officers have law enforcement jurisdiction on tribal lands. That's not true in other States where I believe it's, you know, the Navajo, I think, has total jurisdiction within their – with their reservation lands because that's not a PL-280 State. I mean, this – the sovereignty issue is interesting. It's the first time it's being raised. But I think it's not an open and shut case that they're a separate sovereign and – As I understand it, California also allows some private vehicles to have light bars. Is that right? Certain types of light bars, yes. But they may not be exempt from the safety laws. But, yes, that's true. And so even private vehicles are allowed to have the light bars that these tribal vehicles are seeking to have. Is that right? I don't know about red light because the statutes are different things. Some deal with just light bars, like you could have them have clear light bars. Some of the other statutes that are subject to this argument talk about red lights being the magic light. Yes. Let me ask you a practical question. Why does the county care? I mean, this strikes me as a – in practical terms, as a pretty small potatoes case, but obviously both sides have been litigated. You're here twice. I assume we'll see you again in a few years. Why all this fighting about this? Well, I mean, the county – the county has a defendant suit as a law enforcement agency has an obligation to defend California law and the ability of California to enforce its obviously – I'm asking a different question. You're right. But the practical – It's a practical matter. Why do you care? Behind all of this. Well, I think there's – I think when we were talking about – Is gambling behind all of this? No. I think it's more jurisdictional questions. I think there's concern. Less on display of the light bars, because we're looking at a spectrum of conduct. You know, display of light bars, use of light bars, use of light bars plus emergency lights and siren violation of basic speed laws. On that spectrum, there are different levels of concern. Probably less on just displaying them, although there is some disruption from that. I mean, we don't allow regular people to have red light bars because there is an effect on traffic, whether you're flashing them or not. They slow down quickly. What happens? Well, you know, I've seen police officers park their car beside the road so that they will slow it down. What's your objection to bringing people down to the speed limit? Well, I – Usually you like that, right? It depends. It depends. If you have a car doing it constantly on the same stream at the same time as I'm waiting for the killer practical argument. I haven't heard it yet. Why do you care? I mean, the practicality. I mean, California is interested in not just letting any old person use the red light bars, and you're right. They're not necessarily And I'm not – this is not a question of any old person. This is a regularly constituted law enforcement authority from the tribal – from the reservation. So we're not talking any old person. No, that's what I'm saying. I agree with the Court on that, but it's an area where these will, if you believe them, be used a great deal on this State Highway. They'll be a nice – Well, they're not going to come back and forth any more than they now come back and forth. I mean, they come back and forth. And the issue is whether they get to have a light bar on top of the vehicle as they go back and forth. That's right. But even if – I think my point is even if that's a slight disruption, even the most minimal disruption, you know, of traffic or confusion in the public, they see it, what have you, for traveling on State Highway. I mean, way against here also. I mean, the – Did you put anything in the record as to the practical consequences here? No. But conversely – So we're just guessing. Okay. Well, I mean, again, California has a lawful right to enact legitimate legislation. I mean, I don't think anyone denies that there is at least a public interest in restricting the use of the display of lights, of overhead lights and overhead red lights. There's some public interest in that. You have a letter from the head of the Highway Patrol. Well, I think that – I think, to quote the Highway Patrol Commissioner himself, loses clarity when we're talking about off the reservation. No, he says it clearly loses clarity. He says clearly twice. It's equivocal on that. But, again, the district court noted that the tribe really hasn't presented evidence that it really is disrupting its law enforcement policy either. Do we have problems like this with regard to any other reservations in the State? I don't know. I can't speak for the rest of the State. I don't know. Well, you seem to know what's going on in California. The Attorney General isn't here. If we apply the balancing test, what's the downside for the State? What's the disruption to the State if we balance it under this head circuit? If it's just display, it's what I suggest. I mean, the possibility of confusion, possibly of slowing down, what have you. But I want to flip it and say, again, the tribe has to show some disruption here. And the district court noted that they've had this opportunity to do it, and they've never put in any evidence that this has had any impact. Well, the disruption is obvious. They've got to take the lights off or they've got to cover them up or something. I mean, that speaks for itself. Well, I don't know. You look at the evidence they submitted. They don't show a delay in response or a significant delay in response. And they've had years. I mean, they've been operating without these light bars. Well, why can't we assume if they're on Enclave A, Reservation A, and they get a call that there's something wrong on B, and they want to get over there in a hurry, they want to put the lights on and get in their squad car and go there, they're going to get there a lot quicker if they've got light bars flashing than if they have to adhere to the speed limit. I mean, that is an interesting point. I mean, and, again, that's the balancing test from their point of view. That's right. Now, what's the problem with California? You don't want to – The second part, which is the display of the lights, I mean, it's not just having them on there. It's the use with the lights and the siren and the driving in an emergency mode. But they've got an emergency to take care of. They need police officers in a place where they're not. That's right. That's a significant need that the tribe needs. What is the significant injury to the state's interest by allowing them to go, you know, above the speed limit to the place where the police officers are needed? On state land. On state land. On state land. Across the state highways. Yes, yes, of course. That's what we're talking about. The significant interest is that, I mean, high-speed pursuits are one of the most dangerous things that are out there that police officers do. No, they're not pursuing anyone. You just quoted me. They're not pursuing anyone. This is not a hot pursuit case. They're going to the other place to respond to an emergency call. It's the same thing that the California police officers do every day. They're trained police officers for the tribe. They're certified and trained, just like the county and state police are trained. So what is the, on the balancing test, if we were to apply it, I don't know what we're going to do. If we were to go that route, what is the, now the tribe has shown a significant problem here. They've got to get a policeman over to B and they're at A. What is the downside for the state if we allow that under the balancing test? Well, it may not be a pursuit, but, I mean, the general term is Code 3. Anytime you're operating in emergency mode, there is a greater risk to the public. Every police agency will tell you that. And it's something that they are very careful in terms of restricting their own officers what they do. Well, these people are trained for that. One point I want to make is they're trained, but they don't have to be trained. And I mean, that was an earlier part of this lawsuit is the ability of California to have any control over training of tribal police or recognition of them as police officers on reservation land. The short answer is they don't have to. Let me ask you this. You know, we've got, like this building here, we have GSA police. If you're parked over here, you're parked illegally, and a call goes in, you'll get a GSA policeman here. Or if there's something happening here that's, of course, we've got the security officers. But if there's an emergency from, say, one federal enclave to another, all right, like from the veterans at the hospital in Westwood over to the federal building in Westwood, and you mean that the GSA police can't turn their red lights on and sirens and cross Wilshire Boulevard and go around and see what's going on over there? They're defined as a ‑‑ but, see, they're employed specifically by a federal agency, and the federal agency controls the training and everything else. I mean, that falls within 165. Who do you think controls the Indian tribe? Well, but, see, I ‑‑ I mean, they're wards of the federal government. Although ‑‑ They're wards of the Bureau of Indian Affairs, an interior department. Certainly, but I think that's why looking at the text of the deputation agreement becomes critical. It says the district court recognized, and I think Judge Fletcher touched on it, too, when you look at it, it doesn't make them police for a federal agency. Specifically, they ‑‑ it says they're not. But doesn't the ‑‑ but here's why I'm interested in Mescalero. Even though they may not come within the precise terms of 165E, and I mean, that's an argument, but just for the purpose of argument, let's say for a moment, it does not come within the precise terms of E, it might nonetheless come within the terms of the Mescalero test, as to say they are similarly situated with other vehicles that are allowed to have emergency lights and even to use them. And it may even turn out to be that you look at the other vehicles that are allowed to have and to use them, as you look at that list, all of those people have been trained. Well, it may be that once these tribal police have both been deputized and have been required by the federal government under the terms of the deputization agreement to have training, that they're comparable. And as soon as they're not comparable, as soon as they're not trained, then they're not comparable and you can say, sorry, you can't do it. That's it. I mean, it's something I would have to look at if we brief that issue. Although it seems odd to me to be fact specific as whether they become comparable or not, what they have to demonstrate. But you see the Mescalero test is comparability. Yeah. Well, I see. I think it would be interesting because one of the questions would be if California, for example, weren't happy with the training that Arizona police got in pursuits, I think California would have the right to say we don't have reciprocity with Arizona. Well, then you see then you've got another comparability argument. That's what I'm saying. So in a sense it's just sort of a weak version of an equal protection clause. Yeah. Yeah. Okay. I think that's interesting. I think it hasn't been developed here. Okay. But it's a different argument now than it was before the deputization agreement was signed. That is to say the comparability analysis is a different comparability because you're comparing a different tribal entity or tribal officer than you were before the deputization agreement. I think incrementally, I mean, that's something we'll probably explore in the briefing, but I think as the district court noted when you kind of go through the deputation agreement and what it means or doesn't mean, I think it's much more limited than what the tribe wants to confer on it. When you look at the specific text about saying, look, we're not trying to change the status of these entities vis-a-vis each other. It doesn't look like they're trying to change their status vis-a-vis the states either. I just don't think you can read as much into it as the tribe does. Well, this is one of the reasons I want to know practical what you're after. I mean, in terms of the relevant points of comparison, if you're interested in training, maybe they do have training that's comparable. If you're interested in all these other things, maybe they are comparable. Okay. At the end of the day, it may be the ability of the California to, you know, if they can exclude Arizona when they're uncomfortable, if the tribe reaches a point where they would be uncomfortable with the tribe, where they can exclude them from 160. At the end of the day, that's probably what it is. This is pretty far afield, and you may not be an expert in gambling law, but basically that's the proposition that the federal government set up under the Gaming Act, which is to say comparable gambling. That's true. Okay. If you have any further questions. So you can't tell us what's really going on here. In other jurisdictions, I don't know what's going on here. In Riverside, all I know is that they've apparently functioned without these lights for, gosh, it's got to be five years now or longer. Functioned unhappily. Well, unhappily, but apparently not really impacting their ability to enforce the law. Well, you see, I don't know what status this is, and maybe if I went back I could figure it out. I don't think I've got affidavits in trial and so on, but I hear, well, you know, they stopped him, held him up for 12 minutes, the guy's dead. Well, maybe he would have died, maybe he wouldn't have died, and maybe I don't have an affidavit. But, you know, it stands to reason if you're going to slow these people down going from A to B, some days you're going to have problems. Well, it could be, although, again, it's a PL-280 jurisdiction where, because the state shares law enforcement, you know, that's the Queets, the withdrawn Queets opinion kind of talked about that there the tribal conduct at issue, the state wouldn't pick up the slack, so to speak. There was no way the state would provide those same services on tribal lands. California police officers provide police services on tribal lands. They can go on there under PL-280. So, again, it's not like. So how's that cut? California police can go on to tribal lands with their lights, but tribal police can't go on to California lands with theirs. Congress has expressly given us that right. They have. I mean, I think that's PL-280, because other than that, if we didn't have PL-280, we'd be in different cases. Well, this sounds like sauce for the goose but not for the gander. You guys get to go, and they don't get to come. But, see, that's the express preemptive. Congress wants them to go. Congress wanted us to go. They gave us PL-280. Congress hasn't expressly given it to them to go on state land. They could. I mean. But maybe Ms. Galera's not for them. Well, I think. Okay. All right. Some rebuttal. Thank you, Your Honor. I have just a couple of very brief points. There is, in fact, evidence in the record concerning the Federal Government's belief that light bars are an important and effective law enforcement tool, and I would direct the Court's attention to the declaration of Robert Ecafé. It's tab 77A in the excerpts of record. Mr. Ecafé is the Director of the Office of Law Enforcement Services for the Bureau of Indian Affairs, and in paragraphs 15 through 18, he specifically talks about the need for cabins. He's not talking in general terms. He's talking about the cabins on ban because of their non-contiguous reservation must have the right to operate with light bars, and that light bars are an effective tool in terms of dealing with the public. And he talks about public safety. The light bars. People see in cars with light bars. They tend to slow down. They tend to drive a little more carefully, and so Director Ecafé talks specifically to this point. I want to talk very briefly about the deputation agreement because I feel I may not have made myself clear on this point. The deputation agreement does two things. It specifically authorizes the cabins on law enforcement officers to enforce federal law. That's a power they didn't have before the deputation agreement was entered into. But equally as important, it also federalizes these officers for law enforcement purposes, and there are provisions in the agreement. Section 2A of the agreement says, such commissions shall grant the officers the same law enforcement authority as that of officers of the commissioning agency. Now, I don't think it could be clearer. Once you're commissioned as a tribal officer, you have the same law enforcement authority as, in this case, a BIA officer. That's the commissioning agency. And there's other provisions in here which also make the tribal officers federal agents for certain specified purposes, for purposes of federal tort claims protection, for example. The tribal officers are federal officers. Let me also point out to you that under the Indian Law Enforcement Reform Act, the act that we've talked about in our briefs, it's the act that authorizes the deputation agreements. There's a separate section, and I didn't bring it up with me, I believe it's 2804F, that specifically says that under these types of agreements, tribal officers are also treated as federal employees for certain specified federal criminal laws, including murder of a law enforcement agent or assault on a law enforcement agent. So if you go out and murder a Cabazon police officer with one of these commissions, you have, in effect, murdered a federal official, and you are punishable under the heightened punishments applicable to murdering a federal officer. That comes directly out of the Indian Law Enforcement Reform Act. It's directly applicable to these officers. Let me mention, I'm out of time, let me just mention one thing, Judge Fletcher, with respect to the Mescalero. I think I misunderstood you. You were focusing, I believe, on the phrase non-discriminatory state laws. We, in all candor, we didn't describe that issue, and what I was talking about was something different. I was talking about even under Mescalero, even assuming these are, assuming at the moment these are non-discriminatory state laws, normal conflict preemption under Federal law would still apply to these officers. But my question is, is it possible to see this as discriminatory? I think it certainly is, but in, you know, in fairness and candor, we didn't brief that issue. I was going more to the issue of, assuming they're non-discriminatory, does conflict preemption apply here? Yes, and there is a direct conflict between the Federal mandate that you have these light bars and the county's position that you can't have these light bars. Thank you very much. All right. Thank you. All right. Court will recess until 9 a.m. tomorrow morning. All rise. Court will recess until 9 a.m. Thank you. 165? Yeah. 165. Interesting. Yeah. If I could learn. That's the question. That's the question. Oh, this must be right. That must be right. 165. I'm sorry. Go back in front of Judge Snyder. Well, I got a call from her. She gave me a call. She did? Yes, I did. What was it? The power baby? I had a case with Judge Reimer once that pursued her all the way to the 9th Circuit. It was a district court case. And she was sitting in the 9th Circuit and still had a book in her hand. As the district court judge on the 8th Circuit. They get appointed for special purposes. It was a civilized case. But it went over in a minute. It went nine years. And we came here in 2007 as a district court judge. Really? Well, I guess I will go ahead and submit that. Yeah, I'll go ahead and do that. You can actually talk about it. Yeah. I wouldn't submit it to you. Sure. It's up to you. It's up to everyone. I'm going to do what I need to do. Yeah. I was going to say that. Okay. I'll just record on re-may on the 8th and side of the case. Just for the record. Oh, that's all right. I'm not sure that's how it is. Oh, yeah. Well, have a good trip. All right. Thanks very much. Nice to meet you. Have fun in Newport. Oh, thank you. You too. So long. Good. Mr. Beckman, I have a gum sheet for you so you can. Oh, thank you very much. And do I submit it to the clerk's office? Oh, you can give it to me. I'll give you the conditions. Well, no, I don't have. Do you want just the site? I don't have copies of the case. Can I just give you the site? The site is fine. Oh, okay. Let me do that right now. Okay. Okay. Okay. Yeah.
judges: Pregerson, Cowen , W. Fletcher